lml

## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

WYANDOTTE NATION,                    )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 05-2210-JAR
                                     )
NATIONAL INDIAN GAMING               )
COMMISSION, *et al.*,                )
                                     )
            Defendants.              )
_____)

## <u>MEMORANDUM ORDER AND OPINION</u>

This matter is before the Court upon plaintiff Wyandotte Nation's ("the Tribe" or

"Wyandotte") challenge to the final agency decision of the National Indian Gaming Commission

("NIGC") concluding that plaintiffs may not lawfully conduct gaming on the Shriner Tract, a

parcel of land that the United States holds in trust for the benefit of plaintiffs.  The Tribe moves

for summary judgment pursuant to Fed. R. Civ. P. 56; defendants have responded.[1]  Oral

argument was heard on May 16, 2006.  After reviewing the parties' submissions, and for reasons

set forth in detail below, the Court reverses the NIGC's finding that the Shriner Tract does not

meet the "settlement of a land claim" exception to the Indian Gaming Regulatory Act ("IGRA")

prohibition on gaming on lands acquired after October 17, 1988.

_____

[1]As explained below, however, the Court treats this motion as a review of a final agency action, rather than
a motion for summary judgment.

I.      **Facts**

   *History of the Wyandotte*

   The Tribe's ancestors, known as the Huron, originally resided in Canada, eventually

moving south to the area around Detroit and into what is presently Ohio and western

Pennsylvania, becoming known as the Wyandotte.  In a series of treaties between 1795 and

1832, the Tribe ceded to the United States all of its interest in approximately six million acres of

land in the present states of Ohio and Michigan.  In 1842, the Tribe entered into a treaty with the

United States ceding its remaining Ohio and Michigan lands to the United States in exchange for

an unidentified 148,000-acre tract of land located west of the Mississippi River.  The Tribe then

negotiated to purchase land from the Shawnee Tribe located near Westport, Missouri.[2]

   The Tribe moved westward to the Town of Kansas in 1843, and originally took up

residence on a strip of federal land between the Missouri border and the Kansas River.  Shortly

thereafter, the Tribe learned that the Shawnee Tribe would not complete the sale of the Westport

lands and that the United States would not honor its 1842 Treaty commitment to provide the

Tribe with a 148,000-acre reserve.  On December 14, 1843, the Tribe entered into an agreement

with the Delaware Nation to acquire land in the Kansas Territory.[3]  Under that agreement, the

Delaware Nation gifted to the Tribe three sections of land, each comprising 640 acres, situated in

the Kansas Territory at the confluence of the Kansas and Missouri Rivers.  The Delaware Nation

also sold the Tribe an additional thirty-six sections of land, located west of the gifted land.  The

United States Senate ratified the 1843 Agreement between the Tribe and the Delaware Nation on

---

[2](AR 1084.)

[3](AR 1085.)

July 25, 1848.[4]

Between 1843 and 1855, the Tribe was instrumental in founding and platting Wyandotte City, later renamed Kansas City, Kansas.[5]  In 1855, the Tribe entered into a Treaty with the United States ceding the thirty-six sections of land that it had purchased from the Delaware Nation to the United States.[6]  Specifically reserved from the Treaty cession were three parcels, one of which was the Huron Parcel, which was and remains adjacent to the "Shriner Tract"– the parcel at issue in this case.[7]  The Treaty of 1855 also offered the Tribe's members the option of becoming United States citizens or maintaining their tribal affiliation and relocating to the present State of Oklahoma.[8]  In 1857, 200 tribal members who had elected to maintain their tribal affiliation were removed to the Indian Territory in Oklahoma.[9]  The Wyandotte eventually received their own reservation in the Indian Territory pursuant to the Omnibus Treaty of 1867.[10] In 1893, the Tribe's reservation was allotted to individual tribal members.[11]

Pursuant to the Oklahoma Indian Welfare Act of 1936, the Wyandotte adopted a Constitution and By-Laws, which were ratified on July 24, 1937.  In 1956, the United States terminated federal supervision over the Tribe; the termination attempt was never completed

---

[4]*Id.*

[5](AR 1085.)

[6](AR 370-71.)

[7]*Id.*

[8]*Id.* at Art. I, Art. III; (AR 370-71.)

[9](AR 1085.)

[10](AR 375, 1085.)

[11](AR 1085.)

3

because it was conditioned upon the United States purchasing the Huron Cemetery from the Wyandotte–an event that never occurred.[12]  Congress restored the Wyandotte as a federally-recognized Indian Tribe in 1978.[13]  The Tribe's Revised Constitution was approved in 1985.[14] The United States has held the Huron Parcel, a parcel of land adjacent to the Shriner Tract, in trust for the benefit of the Tribe from 1855 to the present day.[15]  The Tribe contends that the Huron Parcel and land surrounding that parcel, including the Shriner Tract, are of "tremendous historical significance" to the Tribe.

During the 1950's, the Wyandotte filed several actions against the United States with the Indian Claims Commission (the "ICC") involving title determination of the Tribe's claims to land.  The ICC entered judgment for the Tribe.  The judgments were compensation for lands in Ohio that the Wyandottes had ceded to the United States in the 1800's.[16]  To effectuate the judgment, Congress enacted Public Law 98-602 that, *inter alia*, mandated that a portion of the judgment funds be used for the purchase of real property, which the Secretary of the Interior was required to take into trust for the benefit of the Tribe.[17]

---

[12](AR 389-93, 876.)

[13](AR 416.)

[14](AR 1085.)

[15](AR 1113.)

[16]*Sac & Fox Nation v. Norton*, 240 F.3d 1250, 1255 (10th Cir. 2001).  The Tenth Circuit noted that in August 1978, the ICC awarded $561,424.21 to the Tribe, which represented the Tribe's share of the additional compensation awarded to five tribes that ceded approximately three million acres in north central Ohio pursuant to the Fort Industry Treaty of July 4, 1805.  Funds to cover the award were appropriated on October 31, 1978.  In January 1979, the United States Court of Claims awarded $2,349,679.60 to the Tribe as additional compensation for approximately two million acres of land in northwestern Ohio ceded under an 1817 and 1818 treaty.  The funds to cover this award were appropriated on March 2, 1979.  *Id*. at n.7.

[17]*See* Pub. L. 98-602, § 105(b)(1) (1984); (AR 438-43.)

4

### *Procedural Background*

In 1994 and 1995, as part of its efforts to develop a gaming facility in Wyandotte County, Kansas, the Tribe negotiated the purchase of several properties adjacent to the Huron Cemetery.  In January 1996, the Tribe submitted an application to the Bureau of Indian Affairs ("BIA") requesting that the United States accept title to these parcels, including the "Shriner Tract," in trust for the Tribe's benefit, citing the mandatory acquisition provision contained in Pub. L. 98-602.  In memoranda dated February 13, 1996 and May 16, 1996, the Associate Solicitor for Division of Indian Affairs at the Department of Interior concluded that: (1) Pub. L. 98-602 mandated that the Secretary of the Interior acquire the Shriner Tract in trust for the Wyandotte and (2) the Huron Parcel was Wyandotte reservation land on October 17, 1988, and that because the proposed trust parcels were contiguous to the Tribe's reservation, the parcels qualified for gaming under the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2719(a)(1).[18] On or about June 12, 1996, the Assistant Secretary for Indian Affairs ("Assistant Secretary") published a Notice in the Federal Register stating that the BIA intended to accept title to the Shriner Tract into trust for the benefit of the Wyandotte for gaming purposes.[19]

On July 12, 1996, the Governor of the State of Kansas and four other Indian tribes located in the State of Kansas filed suit against the Assistant Secretary, seeking to enjoin the trust acquisition of the Shriner Tract.[20]  After an injunction was entered against the United States,

---

[18](AR 146-52.)

[19](AR 153-54.)

[20]*Sac & Fox Nation of Missouri v. Babbitt*, 92 F. Supp. 2d 1124 (D. Kan. 2000).  These tribes are the Iowa Tribe of Kansas and Nebraska, the Kickapoo Tribe of Indians, the Prairie Band Potawatomi Nation of Missouri, and the Sac and Fox Nation of Missouri in Kansas.

5

the Wyandotte took an emergency appeal to the Tenth Circuit Court of Appeals; on July 15, 1996, the Tenth Circuit vacated the injunction, and that same day, the Secretary accepted title to the Shriner Tract in trust for the Wyandotte's benefit.[21]  In so ruling, the court specifically held that the respective rights of the parties to obtain judicial review of all issues shall be preserved.[22]

The case found its way back to the Tenth Circuit, which concluded that Pub. L. 98-602 is a mandatory trust acquisition statute, that the Secretary had no discretion in accepting title to the Shriner Tract in trust for the Tribe, and that neither National Environmental Policy Act of 1969 (NEPA) nor National Historic Preservation Act (NHPA) analyses were required for the non-discretionary decision to take the property into trust.[23]  The court remanded the case to the district court with instructions to remand to the Secretary to determine whether the Shriner Tract was purchased with only Pub. L. 98-602 funds.[24]

The Circuit refused to give deference to the Secretary's determination that the Shriner Tract was contiguous to the Wyandotte reservation as of October 17, 1988.[25]  The court held that the Secretary lacked authority to interpret the term "reservation" under an exception to the general prohibition against gaming contained in Section 2791 of the IGRA.[26]  As such, the court concluded that because the Huron Cemetery was not a reservation, the Shriner Tract was not

---

[21]*Sac & Fox Nation of Missouri v. Norton*, 240 F.2d 1250, 1257 (10th Cir. 2001).

[22]*Id.*

[23]*Id.* at 1261-63.

[24]*Id.* at 1267-68.

[25]*Id.* at 1265.

[26]*Id.* at 1265-66.

contiguous to the Wyandotte's reservation.[27]  Congress reacted to this part of the court's

determination, however, by passing legislation declaring the authority to determine whether a

specific area of land is a "reservation" for purposes of 25 U.S.C. §§ 2701-2721 was delegated to

the Secretary of the Interior on October 17, 1988.[28]

On remand, the Secretary confirmed that the Shriner Tract was, in fact, purchased with

only Pub. L. 98-602 funds and on March 11, 2002, published a Notice in the Federal Register,

concluding the same.[29]  Plaintiffs challenged the agency decision pursuant to the Administrative

Procedure Act; this Court recently entered an Order affirming the Secretary's decision on

remand.[30]

### The IGRA and the NIGC's Decision

In 1988, Congress enacted the IGRA to provide a statutory basis for the operation and

regulation of Indian gaming.[31]  IGRA provides that "Indian tribes have the exclusive right to

regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by

Federal law and is conducted within a State which does not, as a matter of criminal law and

public policy, prohibit such gaming activity."[32]

IGRA defines "Indian lands" as:

---

[27]*Id*. at 1267-68; *see* IGRA, 25 U.S.C. § 2719(a)(1).

[28]Pub. L. 107-63, § 134 (2001).

[29]67 Fed. Reg. 10,926 (Mar. 11, 2002).

[30]*Governor of Kan. v. Norton*, Case No. 03-4140-JAR, —F. Supp. 2d—, 2006 WL 1266412 (D. Kan. May 9, 2006).

[31]25 U.S.C. §§ 2701-2721.

[32]*Id*. § 2701(5).

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.[33]

IGRA contains a general prohibition on gaming on lands acquired by the United States in trust for an Indian tribe after October 17, 1988.[34]  IGRA provides several exceptions to this general prohibition, three of which are relevant to this case.  Highly summarized, these exceptions are the "last reservation exception,"[35] the "settlement of a land claim exception,"[36] and the "restoration of lands exception."[37]

IGRA creates three classes of gaming.  Class I gaming is defined to include social games played solely for small prizes and traditional forms of Indian gaming,[38] it is regulated solely by tribes, and is subject to neither federal nor state regulations.[39]  Class II gaming is comprised of two categories of games: (1) bingo and other similar games;[40] and (2) "non-banking" card games, in which players compete against each other.[41]  Class II gaming is permissible if the State in which an Indian tribe is located "permits such gaming for any purpose by any person,

---

[33]*Id.* § 2703(4).

[34]*Id.* § 2719.

[35]*Id.* § 2719(a)(2)(B).

[36]*Id.* § 2719(b)(1)(B)(i).

[37]*Id.* § 2719(b)(1)(B)(iii).

[38]*Id.* § 2703(6).

[39]*Id.* § 2710(a)(1).

[40]*Id.* § 2703(7)(A)(i).

[41]*Id.* §§ 2703(7)(A)(ii), 2703(7)(B)(ii).

8

organization or entity," and if "such gaming is not otherwise specifically prohibited on Indian lands by Federal law."[42]  Class II gaming is regulated by Indian tribes, subject to approval and oversight by the National Indian Gaming Commission ("NIGC"), the federal agency that oversees regulation of gaming on Indian lands.[43]  Class III gaming consists of all other forms of gaming, including roulette, slot machines and "banking" card games such as blackjack and baccarat, in which players compete against the "house,"[44] and "electronic or electromechanical facsimiles of any game of chance."[45]  Class III gaming is permissible only if a tribe enters into a formal compact with the State in which it is located, and the compact is approved by the Secretary of the Interior.[46]

Of relevance to this case is Class II gaming, which is within the jurisdiction of Indian tribes if the tribe's governing body has adopted a resolution or ordinance concerning the conduct of Class II gaming, which the Chairman of the NIGC has approved.[47]  In this case, the Tribe submitted a Class II Gaming Ordinance to the NIGC, which the NIGC Chairman approved on June 29, 1994.[48]  On June 19, 2002, the Tribe submitted an Amended Gaming Ordinance to the NIGC, which specifically stated that Class II gaming would be conducted on the Shriner Tract.[49]

---

[42]*Id*. § 2710(b)(1)(A).

[43]*Id*. § 2710(b).

[44]*Id*. §§ 2703(7)(B)(ii), 2703(8).

[45]*Id*. § 2703(7)(B)(ii).

[46]*Id*. § 2710(d)(1).

[47]*Id*. § 2710(b).

[48](AR 1-31, 1083.)

[49](AR 32-60, 61.)

9

The Tribe also submitted documentation to support its assertion that the Shriner Tract met three separate exceptions to IGRA's prohibition of gaming on lands acquired after October 17, 1988.[50] When the NIGC indicated that it needed more time to decide if the Shriner Tract was eligible for gaming, the Tribe withdrew the Amended Gaming Ordinance, and subsequently advised the NIGC that it did not intend to game on the Shriner Tract after all.[51]

One year later, on August 28, 2003, the Tribe commenced gaming at a small Class II gaming facility on the Shriner Tract.[52] The gaming consisted of approximately fifty Class II gaming devices located in temporary trailers. Approximately forty-eight persons were employed at the Tribe's gaming facility.

In March 2004, the NIGC Office of General Counsel ("OGC") provided the Tribe with its written opinion that gaming is not legal on the Shriner Tract under IGRA.[53] The Tribe requested reconsideration of the opinion, and also filed suit against the NIGC in the United States District Court for the District of Columbia, challenging the opinion.[54] On April 2, 2004, the Tribe sought to add several Kansas State authorities as defendants. The D.C. District Court did not act on this motion, but instead transferred the case to the District of Kansas, which granted the motion to amend complaint.[55] The NIGC moved to dismiss the action for lack of a final agency action, a prerequisite for this Court's jurisdiction, and on June 1, 2004, the Court

---

[50](AR 62-160.)

[51](AR 162, 1111.)

[52](AR 1111.)

[53]*Id.*

[54](AR 1111.)

[55]*Id.*

10

granted the NIGC's motion to dismiss.[56]

The NIGC granted the Tribe's request for reconsideration, and determined that some of the language of the opinion was overbroad.[57]  The NIGC revised the opinion accordingly, although the conclusion remained the same.[58]  On July 12, 2004, the NIGC received an Ordinance Amendment from the Tribe for review and approval pursuant to 25 U.S.C. § 2710.[59] The Ordinance Amendment added a new definition to Section 2 of the Tribal Gaming Ordinance that defines "Indian Country" to include all Wyandotte Indian land, including the Shriner Tract. The Tribe waived its right to an administrative hearing and on September 10, 2004, the NIGC issued a final agency decision and order finding that the Tribe may not lawfully game on the Shriner Tract, based on its determination that none of the exceptions to IGRA's general prohibition were applicable.[60]  The Wyandotte brought an action challenging the NIGC's final agency decision in the District Court for the District of Columbia; the case was transferred to this Court on May 15, 2005.

## II.     Standard of Review

Under the Administrative Procedure Act ("APA"), "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[61]  The "ultimate standard of

---

[56]*Id*.  The case remained a live action as to the State of Kansas defendants.

[57]*Id*.

[58]*Id*.

[59](AR 1112.)

[60](AR 1110.)

[61]5 U.S.C. § 702.

review is a narrow one."[62]

The APA authorizes the reviewing court to "compel agency action unlawfully withheld" and to "hold unlawful and set aside agency actions, findings, and conclusions" that the court finds to be, as plaintiffs allege here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[63]  The Tenth Circuit has identified the "essential function" of agency review as an analysis of the following: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion."[64]  While the first two of these factors are relatively straightforward, the "arbitrary and capricious" principle is more difficult to apply.

Although the APA's arbitrary and capricious standard is ordinarily a deferential one,[65] such deference is "not unfettered nor always due."[66]  In fact, the court is required to "engage in . . . a probing, in-depth review."[67]  "An agency's action is arbitrary and capricious if the agency has relied on factors that Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

---

[62]*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[63]5 U.S.C. § 706(1), (2)(A); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-75 (10th Cir. 1994).

[64]*Olenhouse*, 42 F.3d at 1574 (citations omitted).

[65]*Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002).

[66]*See Cherokee Nation of Okla. v. Norton*, 389 F.3d 1074, 1078 (10th Cir. 2004) (citation omitted).

[67]*Citizens to Preserve Overton Park*, 401 U.S. at 415.

view or the product of agency expertise."[68]

"'The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.'"[69]  The reviewing court must decide "'whether the agency considered all relevant factors and whether there has been a clear error of judgment.'"[70]  "Because the arbitrary and capricious standard focuses on the rationality of an agency's decisionmaking process rather than on the rationality of the actual decision, '[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"[71]  "Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record."[72]  "The agency must make plain its course of inquiry, its analysis and its reasoning."[73]  "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles."[74]

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious'

---

[68]*Qwest Commc'ns Int'l Inc. v. F.C.C.*, 398 F.3d 1222, 1229 (10th Cir. 2005) (citing *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).

[69]*Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002) (quoting *Olenhouse*, 42 F.3d at 1574 (footnote omitted)).

[70]*Id.* (quoting *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir. 2000)) (further quotation omitted).

[71]*Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50).

[72]*Colorado Wild, Heartwood v. United States Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Olenhouse*, 42 F.3d at 1575).

[73]*Id.*

[74]*Id.*

standard requires an agency's action to be supported by the facts in the record."[75]  Thus, agency

action will be set aside as arbitrary unless it is supported by "substantial evidence" in the

administrative record.[76]  "Substantial evidence is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion."[77]  "This is something more than a mere

scintilla but something less than the weight of the evidence."[78]  "Evidence is generally

substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a

verdict on a factual conclusion."[79]  It is not the court's duty, however, to substitute its judgment

for that of the agency's on matters within its expertise.[80]  Moreover, the court "typically defer[s]

to the 'reasonable opinions' of agency experts in matters implicating conflicting expert

opinions."[81]

　　　　"In all its actions, an agency is constrained by the statutory authority given by

Congress."[82]  The appropriate framework for analysis is *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council*.[83]  *Chevron* requires a two-step analysis.  The first question "always,

---

[75]*Olenhouse*, 42 F.3d at 1575.

[76]*Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (citing *Olenhouse*, 43 F.3d at 1575).

[77]*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation omitted).

[78]*Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991) (discussing "substantial evidence" standard).

[79]*Hoyl v. Babbitt*, 129 F.3d 1377, 1383 (10th Cir. 1997).

[80]*Colorado Wild, Heartwood v. United States Forrest Service*, 435 F.3d 1204, 1213-14 (10th Cir. 2006) (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).

[81]*Id.*

[82]*Coos v. Babbitt*, 116 F. Supp. 2d 155, 158 (D.D.C. 2000).

[83]467 U.S. 837 (1984).

14

is . . . whether Congress has directly spoken to the precise question at issue."[84]  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[85]  But if the statute is silent or ambiguous, the Court is generally required to defer to the agency's interpretation "if it is based on a permissible construction of the statute."[86]  More specifically, if the Court finds "an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," we must accept the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute."[87]  Alternatively, if the Court does not find an express delegation by Congress, but nevertheless perceives an implicit delegation to the agency on the particular question, it must accept a "reasonable interpretation made by the administrator of [the] agency."[88]  In identifying ambiguity, the Court must look at the whole statutory scheme, not merely the particular provision at issue.[89]

Complicating the matter, the Tenth Circuit has held that the canon of construction that ambiguities are to be resolved in favor of Native Americans may control over the deference otherwise afforded administrative agencies under *Chevron*.[90]  In *Ramah Navaho Chapter v.*

---

[84]*Id*. at 842.

[85]*Id*. at 842-43.

[86]*Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260-61 (10th Cir. 2001) (quoting *Chevron*, 467 U.S. at 843).

[87]*Id*. at 1261 (quoting *Chevron*, 467 U.S. at 843-44).

[88]*Id*. (quoting *Chevron*, 467 U.S. at 844).

[89]*See FDA v. Brown & Williamson*, 529 U.S. 120, 132 (2000) (citations omitted).

[90]*See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997) (citing *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).

15

*Lujan*,[91] the court, construing regulations promulgated by the Secretary of the Interior to implement the Indian Self Determination and Education Assistance Act that were opposed by the tribes, stated that "for purposes of this case, the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes."[92]  The court stated that the outcome hinged on the purpose of the act being interpreted.[93]  The canon only has a role in the interpretation of an ambiguous statute.[94]

　　　　Finally, the Court notes that the Tenth Circuit has held that the use of summary judgment procedures by the district court "is inconsistent with the standards for judicial review of an agency action under the [Administrative Procedure Act]" primarily because summary judgment "permits the issues on appeal to be defined by the appellee and invites (even requires) the reviewing court to rely on evidence outside the administrative record."[95]  Rather, the district court's review of agency actions "must be processed *as appeals*."[96]  Thus, although couched as a motion for summary judgment, the Court reviews the NIGC's decision under the APA review procedures established by the Tenth Circuit and discussed above.

## III.　Analysis

　　　　The Tribe argues that three exceptions to the general prohibition on gaming on after-

---

[91]*Id.*

[92]*Id.*  Subsequently, in *United States v. 162 MegaMania Gambling Devices*, 231 F.3d 713, 718 (10th Cir. 2000), the Circuit cited the Indian canon with approval, but proceeded to resolve the question in favor of the tribes, based in part upon *Chevron* deference.

[93]*Id.*

[94]*Blackfeet Tribe*, 471 U.S at 766.

[95]*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994).

[96]*Id.* at 1580.

acquired lands apply to the Shriner Tract: (1) the Shriner Tract is within the Tribe's last

reservation; (2) the Shriner Tract was taken into trust as part of a settlement of a land claim; and

(3) the Shriner Tract was taken into trust as a part of the restoration of their lands.  The Court

addresses each of these exceptions in turn.

### A.      Last Reservation Exception

The "last reservation exception" provides that gaming may be conducted on lands

acquired after October 17, 1988, provided that: (1) the tribe had no reservation on October 17,

1988; (2) the lands are located in a state other than Oklahoma; and (3) the lands are located

"within the Indian tribe's last recognized reservation within the State or States within which such

Indian tribe is presently located."[97]  The first two parts of this exception are met: the Tribe had

no reservation on October 17, 1988, and the Shriner Tract is in Kansas, not Oklahoma.  The

Court thus turns its attention to the remaining issue: whether the land at issue is within the

Tribe's last recognized reservation within the State or States within which the Tribe is presently

located.

This issue turns on the scope and meaning of the term "presently located," which is not

defined by the IGRA.  To determine "whether Congress has directly spoken to the precise

question at issue," i.e., where the Tribe is "presently located," the Court employs "traditional

tools of statutory construction."[98]  The Court turns to *Chevron's* second step only if "nothing in

---

[97] 25 U.S.C. § 2719(a)(2)(B).  This exception is a separate and distinct exception to the general prohibition of gaming on trust lands acquired after October 17, 1988, than the contiguous land exception ruled on by the Tenth Circuit in *Sac & Fox v. Norton*, 240 F.3d 1250 (10th Cir. 2001).  The court in *Sac & Fox v. Norton* did not address the last reservation exception.

[98] *Seneca-Cayuga Tribe of Okla. v. NIGC*, 327 F.3d 1019, 1037 (10th Cir. 2003) (quoting *Arco Oil & Gas Co. v. EPA*, 14 F.3d 1431, 1436 (10th Cir. 1993) (internal quotation marks omitted)).

the statute directs" a clear answer.[99]  To ascertain the plain meaning of a statute, the court looks to the particular statutory language at issue, as well as the language and design of the statute as a whole.[100]  "In interpreting a statute, the [Tenth Circuit] gives effect to a statute's unambiguous terms.  In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole."[101]  Moreover, this Court must give the words "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import."[102]

Both parties urge plain meaning constructions of the exception, albeit with different results.[103]  The dictionary definition of "presently" is "at the present time."[104]  The word "located" means "to establish oneself or one's business" or "to set or establish in a particular spot."[105]  The NIGC defines "presently located" to mean where the tribe physically resides; to determine where this is, the NIGC looks to the seat of tribal government and population center in concluding that the Tribe is presently located in Oklahoma.[106]

---

[99]*Id.* (quoting *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1302 (10th Cir. 1999) (en banc)).

[100]*Kmart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988).

[101]*United States v. Seminole Nation of Okla.*, 321 F.3d 939, 944 (10th Cir. 2002).

[102]*Williams v. Tayor*, 529 U.S. 420, 432 (2000).

[103]The parties also agree that the fact that the plain meaning of a phrase might result in different interpretations does not render the phrase ambiguous, and that under these circumstances, the rules of statutory construction permit the Court to render its own interpretation of the plain meaning of the statute, then reconcile that interpretation with the agency's application.

[104]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 922 (10th ed. 1995).  "Presently" also has an archaic definition of "at once, before long, or without undue delay." *Id.*

[105]*Id.* at 684.

[106](AR 1113.)

The Tribe argues that a plain reading of section 2719(a)(2) evinces that there is no requirement that the Tribe's seat of government and population center must be located in the state where the land taken into trust is located.  By determining that the Tribe is not presently located in Kansas because its population center and seat of government are located in Oklahoma, the Tribe asserts that the NIGC read the phrase "or States" out of section 2719(a)(2)(B).

The NIGC counters that the phrase "State or States within which such tribe is presently located" is Congress' acknowledgment that there are many tribes whose reservations span several states; for example, the Navaho reservation spans the borders of Arizona, New Mexico and Utah.  The parties dispute, however, whether such tribes are required to have a seat of government in more than one state, or merely a "major governmental presence" on their reservations in those states.  If the former, the Tribe contends that the NIGC rendered the phrase "or States" superfluous, and thus its final decision is inconsistent with the plain meaning of the statute.  The Tribe argues that none of the tribes listed by the NIGC by way of example have their seat of government in more than one state.  If the NIGC applied the same "major governmental presence" test to the Wyandotte as it did for those tribes, the Tribe contends that it would certainly qualify for the exception, as the Wyandotte exercises governmental authority over the Shriner Tract.

The Court agrees with the Tribe that the NIGC's decision appears to nullify the term "or States."  By defining the term "presently located" to mean where a tribe's seat of tribal government is located, the NIGC decision only permits a tribe to qualify for the exception in a single state.  This definition contradicts the plain language of the statute, which expressly applies the last reservation exception to "State or States" where the Indian tribe is presently located.

19

The Tribe seems to accept a less restrictive definition or "presently located" put forward by the NIGC in its brief, i.e., where a tribe has its population center and "*major governmental presence*."[107]  The Court agrees that this is a reasonable interpretation in light of the plain meaning of the phrase "presently located," and adopts the same.

The Court thus turns to the issue of application of the phrase "presently located" to the Tribe in this case.  The Tribe asserts that it exercises governmental authority over the Shriner Tract, as determined by the NIGC in its original Opinion Letter.[108]  In addition, the Tribe maintains that it had a major governmental presence in Kansas by virtue of the Tribal Gaming Commission, which exercised jurisdiction over the Tribe's gaming activities, albeit unauthorized.  The Tribe also asserts that the Huron Cemetery has been held in trust for the Tribe's benefit since 1855 and the record indicates the existence of an inter-governmental agreement with Kansas City, Kansas providing for the maintenance and security of the cemetery.  Finally, the Tribe stresses that approximately 100 of its members reside and work in Wyandotte County.

The Court concludes that, even applying the less restrictive "major governmental presence" definition, the Tribe does not qualify for the last reservation exception.  Although there appears to be no dispute that the Tribe exercises governmental *power* over the Shriner Tract, the Court does not agree that this constitutes a major governmental *presence* in Kansas.  On the contrary, it appears that the Wyandottes' governmental power was primarily exercised from Oklahoma.  While the Tribe has an inter-governmental agreement with Kansas City

---

[107]Defendants' Brief in Support of Agency Action at 12 (emphasis added).

[108](AR 1093.)

providing for the maintenance and security of the Huron Cemetery, there is nothing in the record that indicates the Tribe performs any of this oversight.  Nor is there anything in the record to support the Tribe's assertion that the Tribal Gaming Commission constituted a major governmental presence, through regular meetings or inspections by the commission.  Thus, the Tribe's governmental presence in Kansas appears to be peripheral rather than major.

The Court also rejects the Tribe's assertion  that approximately 100 members constitutes a "population center."  These tribal members resided in Wyandotte County at the time of the NIGC decision and shortly after the gaming activities were shut down by the Attorney General of Kansas.  Although the Tribe may have a presence in Kansas, its population center is Oklahoma.  Accordingly, the Court finds that the Shriner Tract does not meet the last reservation exception, and the NIGC's decision is upheld on this issue.

B.       Settlement of a Land Claim Exception

The Tribe argues that the NIGC ignored the plain language of IGRA in concluding that the Shriner Tract did not qualify for gaming under the "settlement of a land claim" exception in Section 2719(b)(1)(B)(i).  That section provides for an exception to the general prohibition on gaming on land taken into trust after 1988 if the land was taken into trust "as part of a settlement of a land claim."[109]  Specifically, the Tribe argues that the Shriner Tract was taken into trust as part of the settlement of a land claim because the Wyandotte acquired the land pursuant to a settlement of its title claims against the United States, filed with the ICC.[110]  In those proceedings, the Wyandotte, along with other tribal signatories to the Treaty of Greenville,

---

[109]25 U.S.C. § 2719(b)(1)(B)(i).

[110]*Strong v. United States*, 30 Ind. C. Comm. 8 (I.C.C. 1973) ("Docket 139"); *Strong v. United States*, 30 Ind. C. Comm. 337 (I.C.C. 1973) ("Docket 141").

asserted claims for the tribal land cessions to the United States under the Treaty of Fort Industry of 1805 and the Treaty of September 29, 1817, respectively.  The claims asserted by the Wyandotte in both Docket 139 and Docket 141 involved determinations of (1) whether the tribes held recognized title to the property, and (2) if so, what percentage interest each tribe held.  The United States disputed that the Treaty of Greenville granted recognized title to the tribes.[111]  The ICC held that the Tribe was granted recognized title to what was known as the Royce Areas 53 and 54 by virtue of two treaties and that the ICC had to apportion interest in the areas among various tribal signatories to the treaties before the ICC could evaluate damages.[112]  The Tribe asserts that a claim requiring a determination of ownership of title to land is a "land claim" within the meaning of the exception.  After considering these arguments, the NIGC concluded that the "land claims" exception did not apply because the ICC granted the Tribe a money judgment.

### *"Land Claim"*

As with the "last reservation" exception, the interpretation of the land claims settlement exception must begin with the language of the statute itself.  The initial question to be addressed is whether the Tribe's ICC claims were "land claims" within the meaning of section 2719(b)(1)(B)(i), which does not define the term.  As with the last reservation exception, both parties contend that the term "land claim" is clear and unambiguous, with divergent results.  There is no dispute about the meaning of the word "land," which Webster's defines as "the solid

---

[111] *Strong* (Docket 139), 30 Ind. C. Comm. at 15.

[112] (AR 1114.)  In Docket 139, the ICC determined that the Wyandotte had "title to an undivided one-fifth interest in Royce Areas 53 and 54. . . ."  *Strong* (Docket 139), 30 Ind. C. Comm. at 21.

ground of the earth."[113]  The Black's Law Dictionary definition of "claim" is "[t]he aggregate of operative facts giving rise to a right enforceable by a court," or "assertion of an existing right."[114] Webster's defines "claim" as "a demand for something as rightful or due."[115]

The NIGC asserts that a claim for land clearly means a claim for a *return* of land, not a *monetary* award, which is what the Tribe received.  The NIGC focused on the nature of the claim brought by the Tribe and the resulting award to the Tribe, stating that the Tribe brought claims before the ICC and Claims Court exclusively for money damages, not over title to land itself, and that the award was limited to money damages.  The NIGC reasoned:

> While the ICC may have evaluated whether the Tribe previously held title to land, and had to assign interests among the various tribes to ascertain money damages, this does not transform the claim into a land claim.  The claim was for money, not the land, and the evaluation undertaken by the court to arrive at the amount of money damages does not change that.  Furthermore, Pub. L. 98-602 was merely a mechanism with which to distribute judgment funds awarded to the Tribe.[116]

In other words, as articulated by counsel at oral argument, in order to qualify for the exception a claim must be related to the land itself, rather than a wrong committed over the land.

This approach is problematic.  The plain meaning of "land claim" does not limit such claim to one for the return of land, but rather, includes an assertion of an existing right to the land.  As the Tribe points out, the word "land" modifies the word "claim," not "settlement," and thus a "land claim" means that the operative facts giving rise to a right arise from a dispute over

---

[113]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 653 (10th ed. 1995).

[114]BLACK'S LAW DICTIONARY 264 (8th ed. 1999).

[115]MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 210 (10th ed. 1995).

[116](AR 1115.)

23

land, not that the land claim be resolved by the return of land.  Thus, the plain language of

section 2719(b)(1)(B)(i) does not preclude the land claim brought before the ICC in this case

from falling within that exception.[117]  By interpreting the term "land claim" as limited to claims

for the return of land, the NIGC failed to give the words of section 2719(b)(1)(B)(i) "their

ordinary, contemporary, common meaning."

> The NIGC's reasoning in support of its interpretation is also problematic:

>> Congress was fully aware of the ICC and the pre-existing process
>> created for tribes to bring claims against the United States when it
>> enacted IGRA.  Congress could have included a broad exception to
>> the gaming prohibition on lands taken into trust for property
>> purchased with funds awarded by the ICC and the Claims Court;
>> however, no such exception exists in the legislation.  Instead,
>> Congress chose to narrowly except lands taken into trust "as part
>> of . . . a settlement of a land claim."

>> To find that ICC money judgments fit within the plain language of the
>> after-acquired lands exception would result in the exception swallowing
>> the rule. . . . Interpreting the land claim settlement exception to
>> apply any time a tribe uses such monetary judgments to purchase
>> land would open up the exception far beyond what was intended.[118]

By restricting its interpretation of "land claim" to mean only a claim for the return of land, the

NIGC appears to have focused on the remedy sought by a tribe rather than the substantive claim

itself.  Until 1946, Indian tribes could not litigate claims against the United States unless they

obtained specific permission from Congress.  The Indian Claims Commission Act ("ICCA") was

enacted that year, creating a quasi-judicial body to hear and determine all tribal claims against

---

[117]Indeed, counsel for the NIGC conceded at oral argument that the land claim exception does not require a present claim as opposed to a historical claim to the land.

[118](AR 1115-1116.)

the United States that accrued before August 13, 1946.[119]  The period for filing tribal claims with

the ICC was limited to five years.[120]  The ICCA limited the scope of relief for tribes to an award

of monetary compensation rather than the return of disputed lands or the confirmation of title.[121]

Federal courts, including the Tenth Circuit, have held that the ICC was the exclusive forum for

Indian land claims, including claims such as the Wyandottes' to litigate the validity of title to

lands that were ceded to the United States and to be recompensed for government actions

inconsistent with those titles.[122]  Thus, the NIGC's characterization of the nature of the ICC case

as one "exclusively" for money damages ignores the fact that this was the exclusive remedy for a

tribe bringing a land claim under the ICC.[123]

---

[119]The ICCA authorized the ICC to hear five types of claims: (1) claims in law or equity arising under the Constitution, laws or treaties of the United States, and Executive Orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.  ICCA § 2, 25 U.S.C. § 70a (1976).

[120]ICCA § 12, 25 U.S.C. § 70k (1976).  Although the ICCA provided that the Commission would terminate at the end of ten years, Congress extended its life several times, finally dissolving in 1978, at which time its remaining cases were transferred to the Court of Claims.  Act of Oct. 8, 1976, Pub. L. No. 94-465, § 2, 90 Stat. 1990 (codified as amended 25 U.S.C. § 70v-3) (Supp. V 1981).

[121]*Navaho Tribe v. New Mexico*, 809 F.2d 1455, 1461 (10th Cir. 1987) (citation omitted).  The Tenth Circuit noted that in doing so, Congress made a "fundamental policy choice" "out of the sheer, pragmatic necessity that, although any and all accrued claims could be heard before the Commission, land title in 1946 could not be disturbed by the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries. Those injustices would have to be recompensed through monetary awards." *Id*. at 1467.  *See* 25 U.S.C. §§ 70-70v (1976).

[122]*Id*. at 1465-69.

[123]In 1966, Congress gave the federal district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States that are brought by recognized Indian tribes.  28 U.S.C. § 1362. The Supreme Court subsequently established that the federal courts have federal question jurisdiction over tribal claims and gave tribes, seeking to protect their property rights, a federal common law right of ejectment.  *See Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661 (1974) (*Oneida I*) and *Oneida County, N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226 (1985) (*Oneida II*).  In fact, the Tribe unsuccessfully brought such an

The NIGC's focus on the ICC money judgment might pass muster if the Tribe had merely purchased the Shriner Tract with money received from a claim brought before the ICC. That is not the case, however, because Congress mandated that $100,000 of the Tribe's ICC judgment funds be utilized to purchase land to be taken into trust for the benefit of the Tribe as a means of effectuating a judgment that resolved the Tribe's land claims.  The Wyandotte used the funds appropriated by Congress in satisfaction of the ICC judgment to acquire the Shriner Tract, and the Secretary, based upon the mandate of Pub. L. 98-602, accepted title to the Shriner Tract in trust for the Tribe.  The NIGC has failed to cite any other instance where Congress issued such a mandate, and thus its "exception swallows the rule" argument is without support.[124]

As stated by the Supreme Court, one of the reasons for setting aside an agency decision is "if the court finds that the agency . . . entirely failed to consider an important aspect of the problem."[125]  In this case, the NIGC's focus on the monetary nature of the ICC judgment and its dismissal of Pub. L. 98-602 as merely a "mechanism" with which to distribute judgment funds awarded to the Tribe, leads the Court to conclude that the NIGC failed to consider an important aspect of a factor upon which it relied in making its decision.  That the remedy for a land claim is monetary, rather than specific relief, is irrelevant where, as here, Congress *mandated* that the monetary remedy be utilized to purchase land to be held in trust for the benefit of the Tribe.  The

action to quiet title to the land acquired from the Delaware Nation and ceded to the United States in the 1855 treaty in *Wyandotte Nation v. Unified Government of Wyandotte County/Kansas City, Kansas*, 222 F.R.D. 490 (D. Kan. 2004).  The Tribe's claims were dismissed, however, as the court concluded that they were time-barred under the ICCA.

[124]Moreover, not all cases before the ICC were cases involving "land claims."  In fact, Indian claims are varied, including claims arising under the Constitution, tort and moral claims.  *See* 25 U.S.C. § 70a (1976).

[125]*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

Court therefore concludes, after much reflection, that the NIGC's articulated reason for its interpretation is arbitrary, capricious and unsupported by law.

### *Conflict with Prior Decision*

The Court also finds that the NIGC's decision is at odds with a determination by the Secretary of the Interior that certain Seneca Nation lands were acquired as part of the settlement of a land claim.  As described in the Secretary's November 12, 2002 Letter Opinion and in *Huron Group, Inc. v. Pataki*,[126] the Seneca Nation, like the Wyandotte, sought to game on a parcel of land that was taken into trust after October 17, 1988, and asserted that gaming should be allowed on its after-acquired land because the land fell within the "settlement of land claim" exception.[127]  The Seneca based its assertion that the exception was applicable because the land was purchased with funds obtained from the "Seneca Nation Settlement Act of 1990" (the "Settlement Act"), which was enacted to "assist in resolving the past inequities involving the 1890 leases and to secure fair and equitable compensation for the Seneca Nation. . . ."[128]  The historical basis of the Settlement Act is 99-year leases of the Seneca lands that were scheduled to expire, and payments to the Seneca Nation under prior leases that were below the actual lease value of the property.[129]  The purpose of the Settlement Act was to compensate the Seneca for the underpayments pursuant to the prior leases, and to facilitate the negotiation of new leases of tribal lands.[130]  Pursuant to the Settlement Act, the Secretary of the Interior and the State of New

---

[126]785 N.Y.S.2d 827 (N.Y. Sup. 2004).

[127]*Id*. at 834-37.

[128]25 U.S.C. § 1774(b)(2).

[129]*Id*. § 1774(a).

[130]*Id*. § 1774(b).

York paid the Seneca Nation a total of $60 million; there was no "claim for return of land."[131]

Congress declared that a portion of that $60 million be used "for economic or community

development," and that the Seneca Nation "may" acquire "[l]and within its aboriginal area in the

State or situated within or near proximity to former reservation land . . . ."[132]

Although the Secretary of the Interior determined that the Seneca Nation qualified for the

land claim exception,[133] she stressed in her Letter Opinion that the decision regarding the

application of the settlement of a land claim exception to the Seneca lands should not necessarily

be relied on in other circumstances:

> I am nevertheless concerned that the elements of this Compact
> may be used by future parties to proliferate off-reservation gaming
> development on lands not identified as part of a Congressional
> settlement but instead on lands selected solely based on economic
> potential, wholly devoid of any other legitimate connection.  Thus,
> to the extent that other states and tribes model future compacts
> after this one, and seek to have the United States take land into
> trust for these gaming ventures, they should understand that my
> views regarding land acquired through a Congressional settlement
> are somewhat different from my views when a tribe is seeking a
> discretionary off-reservation trust acquisition or a two-part
> determination under IGRA. While I do not intend to signal an
> absolute bar on off-reservation gaming, I am extremely concerned
> that the principles underlying the enactment of IGRA are being
> stretched in ways Congress never imagined when enacting
> IGRA.[134]

While the Secretary's concerns are well taken, the Court notes that this case involves neither a

discretionary trust acquisition, nor a two-part determination under IGRA, but a mandatory trust

---

[131]*Id*. § 1774(d).

[132]*Id*. §§ 1774(d)(2), 1774f(c).

[133](AR 737-738.)

[134]*Id*.

acquisition pursuant to Pub. L. 98-602.

The NIGC contends that the Seneca Nation case is distinguishable from the instant case because the land at issue in that case was purchased pursuant to the Settlement Act.  Under the terms of the Seneca Settlement Act, Congress expressly provided that the Seneca Nation was to use settlement funds to acquire "land within the aboriginal area in the State or situated within or near proximity to former reservation lands."[135]  The Compact further provided that the settlement funds were to be used to acquire parcels in Buffalo and the City of Niagra Falls.[136]  The Secretary noted that the Seneca Nation submitted sufficient documentation demonstrating that the exterior boundaries of its former reservation overlap a portion of present-day Buffalo and are within fourteen miles of the exterior boundary of the City of Niagra Falls.[137]  Moreover, the NIGC argues, the Seneca Nation maintained an active, ongoing presence and history in New York.  The settlement was reached in 1990 because the State had leases with the tribe for vast amounts of land that were set to expire in 1991.[138]  The land was in the tribe's aboriginal territory and the tribe had never fully ceded the land.[139]

By comparison, the Wyandotte brought an action against the United States with the ICC for tribal land cessations, which required the determination of title claims to the areas identified as Royce Areas 53 and 54.  The ICC determined that the Tribe had recognized title to an undivided one-fifth interest in Royce Areas 53 and 54 and awarded the Tribe compensation for

---

[135]25 U.S.C. § 1774f(c).

[136]*Id.*

[137](AR 740-741.)

[138]25 U.S.C. § 1774.

[139]*Id.*

the lands that were ceded.[140]  Thereafter, in October 1984, Congress enacted Pub. L. 98-602 "to provide for the use and distribution of certain funds awarded the Wyandotte Tribe of Oklahoma" as a result of the ICC litigation.[141]  Congress allocated eighty percent of the ICC judgment to the Tribe's members in the form of per capita payments, and required that twenty percent "be used and distributed in accordance with" a series of directives.[142]  Key among the directives, for purposes of this issue, was one providing that "[a] sum of $100,000 shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe."[143]  The Tenth Circuit held that this directive imposed a nondiscretionary duty on the Secretary of the Interior to take the Shriner Tract into trust.[144]  Thus, Pub. L. 98-602 was a congressional act that provided for the distribution of funds awarded as a result of an ICC judgment.  Unlike the Seneca Settlement Act, which stated that the Seneca "may" acquire land with the allocated funds, Pub. L. 98-602 required that the Wyandotte expend $100,000 of the funds awarded as a result of the ICC judgment for the purchase of real property and required the Secretary of the Interior to accept the land into trust.[145]

    After comparing the facts of this case with the Seneca Nation, the Court finds that the

---

[140]*Strong* (Docket 139), 30 Ind. C. Comm. at 21.

[141]Pub. L. 98-602 (1984).

[142]*Id.* § 105.

[143]*Id.*

[144]*Sac & Fox Nation v. Norton*, 240 F.3d 1250, 1262 (10th Cir. 2001).  This Court recently affirmed the Secretary's decision on remand from the *Sac & Fox* case that only Pub. L. 98-602 funds were used to purchase the Shriner Tract.  *See Governor v. Norton*, Case No. 03-4140-JAR, — F.3d —, 2006 WL 1266412 (D. Kan. May 9, 2006).

[145]Pub. L. 98-602, § 105(b)(2).

NIGC's reasoning was internally contradictory, further supporting its finding that the Final Determination in this case is arbitrary and capricious.[146]  Specifically, the NIGC's reasoning required the Wyandotte to establish "a claim for the return of land," whereas the Seneca Nation was required to establish a claim for compensation for a breached lease.  The NIGC has required the Wyandotte to meet criteria that it has not required in other cases, and the Secretary of the Interior has allowed lands to qualify for the settlement of lands exception in circumstances at least as suitable as the case at bar.  Because the agency's action was internally inconsistent, it was not founded on a reasoned evaluation of the relevant factors and must be set aside.[147]

### C.    Restored Lands Exception

The Tribe argues that the NIGC applied inappropriate criteria when analyzing whether the Tribe met the "restored lands" exception to IGRA's general prohibition of gaming on land acquired in trust after October 17, 1988.  Section 2719(b)(1)(B)(iii) provides that the prohibition will not apply when lands are taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."  This analysis requires a two-part determination: (1) that the Tribe is a "restored" tribe, and (2) that the Shriner Tract was taken into trust as part of a "restoration" of lands to such restored tribe.[148]  The parties agree that the Tribe is a restored tribe.[149]  Thus, the Court turns its attention to whether the Shriner Tract was taken into trust as

---

[146]*See Defenders of Wildlife v. EPA*, 420 F.3d 946, 959 (9th Cir. 2005) (citations omitted).

[147]*See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574-75 (10th Cir. 1994) (citations omitted).

[148]*Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney for the W. Dist. of Mich.*, 198 F. Supp. 2d 920, 928 (W.D. Mich. 2002) ("*Grand Traverse II*"), *aff'd*, 369 F.3d 960 (6th Cir. 2004).

[149]The Tribe was terminated by the Act of August 1, 1956, 70 Stat. 893, and was restored to federal recognition by the Wyandotte, Peoria, Ottawa and Modoc Tribes of Oklahoma Restoration of Federal Services Act, 92 Stat. 246 (1978) (codified at 25 U.S.C. § 861).

part of a restoration of land.

### *"Restored" and "Restoration"*

IGRA does not define "restored" and "restoration."  Thus, this court must give the words "their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import."[150]  Several courts have had occasion to address the "restoration of lands" exception, and have concluded that the term "restoration" has a plain meaning that may be applied.[151]  The Sixth Circuit has approvingly cited the *Grand Traverse II* court's investigation into the dictionary definitions of "restore" and "restoration:"

> The [*Grand Traverse II* court] noted that the dictionary definition of "restore" includes the following meanings: to give back (as something lost or taken away), make restitution of, return, to put or bring back (as in existence or use); and to bring back or put back into a former or original state.  The court also looked to the dictionary definition of "restoration," which includes the following meanings: an act of restoring or the condition or fact of being restored; as bringing back to or putting back in to a former position or conditions, reinstatement, renewal or reestablishment.[152]

Under a plain reading of the provision, all restored tribes that reacquired lands previously held by the tribe would qualify for the exception.

### *Limitation on Restored Lands*

Nonetheless, courts have held that the term may be interpreted in a variety of ways "to

---

[150]*Williams v. Taylor*, 529 U.S. 420, 431-32 (2000) (internal quotation marks and citation omitted) (referring to Webster's Dictionary definitions to determine the meaning of a statutory term).

[151]*Grand Traverse II*, 198 F. Supp. 2d at 928 (emphasis added); *Coos*, 116 F. Supp. 2d at 161; *Oregon v. Norton*, 271 F. Supp. 2d 1270, 1279 (D. Or. 2003) (adopting by reference "the sound reasoning and analysis in [*Coos*] and in *Grand Traverse II*).

[152]*Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the W. Dist. of Mich.*, 369 F.3d 960, 965 (6th Cir. 2004) (citing *Grand Traverse II*, 198 F. Supp. 2d at 928; WEBSTER'S NEW THIRD INT'L DICTIONARY 1936 (1976)).

place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion."[153]   As noted by the NIGC, the court in *Grand Traverse II* has suggested a three-part test to determine what land qualifies under the "restoration of lands" exception:

> Given the plain meaning of the language, the term "restoration" may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion. For example, land that could be considered part of such restoration might appropriately be limited by **the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration**.[154]

This interpretation was adopted by the District Court for the District of Columbia in *Confederated Tribes of Coos v. Babbitt*, which noted that such limitations would avoid a result that "any and all property acquired by restored tribes would be eligible for gaming.[155]   The Associate Solicitor, Department of the Interior, adopted a similar interpretation in his *Coos* Opinion on remand from the *Coos* court.[156]   Citing these cases and the Associate Solicitor's Opinion, the NIGC adopted the *Grand Traverse II* factors and used them in its analysis of the restoration of lands exception.   The three prongs, as set forth above, are (1) the factual circumstances of the acquisition, (2) the location of the acquisition, and (3) the temporal differential between restoration of the tribe and the acquisition.[157]

---

[153]*Grand Traverse I*, 46 F. Supp. 2d 689, 700 (W.D. Mich. 1999).

[154]*Grand Traverse II*, 198 F. Supp. 2d at 935 (emphasis added).

[155]116 F. Supp. 2d at 164.

[156](AR 1118-19.)

[157]*Grand Traverse II*, 198 F. Supp. 2d at 935.

While the Tribe concedes that this statement of the law is correct, it urges that the NIGC's

application of two of these factors, location and temporal relationship, is not in accordance with

the law.  The Court discusses each factor in turn.

### 1.      Factual Circumstances

The factual circumstances of the acquisition are not at issue.  Under this factor, the

factual circumstances of the acquisition must provide indicia of restoration.[158]  The Tribe was

restored to federal recognition on May 14, 1978; the Secretary of Interior approved the Revised

Constitution on May 30, 1985.[159]  The Tribe negotiated the purchase of the Shriner Tract in 1994

and 1995, and thereafter submitted an application to the BIA requesting the United States accept

the Shriner Tract into trust.  This factor appears to be neutral, and will be construed in the

Tribe's favor.

### 2.      Location

The second, and arguably most important, component of the test for the restoration of

land exception relates to the location of the land in relation to the tribe's historical location.

Courts have been careful to observe that the restoration of lands encompasses more than simply

the return of a tribe's former reservation,[160] although "placement within a prior reservation of the

[tribe] is significant evidence that the land may be considered . . . restored."[161]

---

[158]*Coos*, 116 F. Supp. 2d at 164 (quoting *Grand Traverse II*, 198 F. Supp. 2d at 967-72).

[159](AR 416, 1085.)

[160]*City of Roseville v. Norton*, 348 F.3d 1020, 1028 (D.C. Cir. 2003).

[161]*Grand Traverse II*, 198 F. Supp. 2d at 937.

The NIGC began its analysis by evaluating the physical location of the Shriner Tract, which is located in Kansas City, Kansas.  The NIGC noted however, that the seat of the Wyandotte Tribal government, its present trust lands and its population center are in Wyandotte, Oklahoma, a distance of approximately 175 miles from Kansas City.  The Tribe's convenience store, daycare center, seniors program and educational assistance programs are also located in Wyandotte, Oklahoma.  It was clear to the NIGC that the Shriner Tract is situated far from where the Tribe is actually located in Wyandotte, Oklahoma.  This contrasts significantly from the other Indian lands cases analyzing the restoration of lands exception.  As the NIGC discussed in depth in its opinion, the other tribes had occupation centers near the proposed gaming cites and had not left the areas since aboriginal times.[162]  While the NIGC declined to establish a standard for determining what is a reasonable distance for purposes of the restoration of lands analysis, it concluded that in this case, a distance of 175 miles between the parcel and the tribal center is not close enough to establish a geographical connection.[163]

The NIGC also concluded that the Tribe does not have a sufficient historical nexus to the Shriner Tract to qualify it as restored land.  The NIGC noted that the Tribe was transient for much of its history, making its way from Huronia to Michigan, Pennsylvania, Missouri, Ohio and Kansas before reaching its present location of Oklahoma.  The Tribe occupied the Shriner Tract area from 1843 to early 1855–only eleven full years.  By contrast, the NIGC noted that in all of the cases that have analyzed the restored lands exception, there was a "significant,

---

[162](AR 1119.)

[163]*Id.*

longstanding historical connection to the land–sometimes even an ancient connection."[164]  The NIGC declined to find that occupation of land for a period of eleven years, despite that "significant roots" were put down, rises to the level of an historical connection.[165]  To so find, the NIGC would conceivably be bound to find that the Tribe also had an historical nexus to Michigan, Ohio, Pennsylvania and Missouri, and that if land were taken into trust in those locations, the Tribe could game there.[166]

Finally, the NIGC found that the Tribe had not shown that it had a presence in the Shriner Tract area upon termination.  The Tribe left Kansas in 1855, when it ceded the lands to the United States.  Because the Tribe's status was terminated in 1956,[167] more than 100 years had elapsed between the time the Tribe left the Shriner Tract and the time the Tribe was terminated. By contrast, in the other cases, it was important to the determination of restored lands that the tribes had a presence on the lands upon termination.

The Tribe contends that the NIGC erroneously decided the location criteria, and that it should have determined that the Shriner Tract constitutes restored lands because it is within the Wyandotte's prior reservation in the State of Kansas.  The Tribe also asserts that the NIGC improperly replaced the historical nexus test with a present nexus test.  The Tribe argues that the courts in *Grand Traverse II* and *Coos* held that there must be a nexus between the recently-acquired trust lands and the lands that the tribe *historically* occupied.  By contrast, the Tribe

---

[164](AR 1121.)

[165]*Id.*

[166]*Id.*

[167]Act of August 1, 1956, 70 Stat. 893.

argues, the NIGC's decision erroneously requires a nexus between the recently-acquired trust lands and the lands that the Tribe *presently* occupies. Such a requirement is arbitrary and capricious, the Tribe concludes, because the NIGC inserted a prerequisite onto the restored lands exception that does not exist.

The Tribe takes great issue with the NIGC's apparent emphasis on the physical distance between the Shriner Tract and the Wyandotte's seat of government, noting that the federal government forced the Wyandotte to uproot to Oklahoma. Moreover, the Tribe contends, the Wyandotte has maintained a significant presence in the State of Kansas. The Tribe attempts to distinguish itself from prior agency decisions, in particular the land determination regarding the Mechoopda, where the existence of an historic tribal trail across the parcel and the parcel's location one mile from three buttes that were prominent in a tribal myth were important to the determination. The Tribe finds it difficult to comprehend how a trail elevates the land at issue in Mechoopda to a higher significance than the Shriner Tract, which is adjacent to the Huron cemetery where the Tribe's ancestors are buried and which the Tribe has held since the mid-1800's. This, the Tribe argues, constitutes an attempt by the NIGC to impose a novel and arbitrary present-use occupation requirement upon the Wyandotte.

The Court disagrees. As stated previously, the Court's role in reviewing the NIGC's decision in applying the three prongs of the restoration analysis is not to inject its own views or pick sides,[168] but rather, to ascertain whether the NIGC examined the relevant data and articulated a rational connection between the facts found and the decision made.[169] A careful

---

[168]*Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

[169]*Id.*; *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994).

examination of the record reflects the NIGC has examined the relevant data regarding the

location factor and there is a rational connection between the facts found and the NIGC's

decision that the Tribe did not meet this aspect of the "restored lands" exception.  In evaluating

the Tribe's historical nexus to the Shriner Tract, the NIGC cited to its *Grand Traverse II* opinion

for its finding that restoration was shown by "substantial evidence tending to establish that the

 . . . site has been important to the tribe throughout its history and remained so immediately on

resumption of federal recognition."[170]  The NIGC also cited to previous opinions involving the

Mechoopda Indian Tribe and the Bear River Band of Rohnerville Rancheria, noting that the

longstanding historical and cultural connections those tribes had to the acquired trust lands.  The

NIGC then evaluated the Tribe's historical nexus to the Shriner Tract, and concluded that the

Tribe had not shown a sufficient historical nexus.  The Court finds nothing infirm about the

manner in which the NIGC evaluated the historical nexus and agrees with the NIGC that in order

to evaluate this issue fully, the agency must evaluate the present circumstances of the Tribe and

its relationship with the land at issue.  Contrary to the Tribe's assertion, the Court finds nothing

in the *Grand Traverse II* or *Coos* opinions that would prohibit this approach.  It cannot be said

that the NIGC clearly erred in this regard.

Moreover, the Shriner Tract significantly differs from the trust lands at issue in previous

opinions in terms of geographical distance from the Tribe's occupation area in Oklahoma.  As

the NIGC discussed in depth in its opinion, the other tribes had occupation centers near the

proposed gaming sites and had not left the areas since aboriginal times.[171]  The NIGC recognized

---

[170](AR 1120.)

[171](AR 1119-21.)

that the Wyandottes' unfortunate history of forced relocation left the Tribe in a different position with regard to historical occupation than the other tribes, but concluded nonetheless that the Shriner Tract's distant location and relatively minor place in the Tribe's history militates against applying language another court used in a different context.  Additionally, prior agency opinions have emphasized trust land's significance to a tribe.  In this case, the NIGC concluded that the Shriner Tract, while of importance to the Tribe, does not have the continuing significant presence in the Tribe's history as the parcels in prior land opinions, having spent less than twelve years in Kansas before ceding the land and moving to Oklahoma.  Although the significance of the Huron Cemetery to the Wyandottes cannot be denied, key to the location factor is the historical significance of the Shriner Tract; the fact that the tract is adjacent to this non-reservation, isolated burial ground does not render the agency's conclusion arbitrary.  Again, the Court cannot conclude that the NIGC clearly erred in this regard.

> 3.    **Temporal Relationship**

In this case, there was an 18-year gap between the Wyandotte's restoration and acquisition of the Shriner Tract.  The Tribe argues that the temporal relationship of the acquisition to the Tribe's restoration is similar to the timelines in the previously cited cases applying the restored lands exception.  The Tribe notes that in both its case and the *Grand Traverse II* case, it took years from the time of restoration and approval of a tribal constitution, a necessary precursor for any trust acquisition.  The Tribe further argues that in both cases, the subject trust acquisitions were the first meaningful acquisitions after restoration, and both were part of a concerted effort to acquire trust lands as part of an economic development program.  Finally, the Tribe argues that in both cases, the subject lands were previously ceded to the United

States by treaty.

The NIGC concluded there were several distinctions between the facts of this case and the *Grand Traverse II* case.  First, the Tribe was not required to have an approved constitution prior to the acquisition of land in trust.  In fact, the Tribe's constitution was approved in 1985, and the United States took land into trust for the Tribe in 1979 and 1984, in Wyandotte, Oklahoma.  Second, the Tribe had substantial restoration of land preceding the Shriner Tract.  In fact, three parcels of land were restored: one 1.5 acre parcel in 1979 and two parcels in 1984, one 3.8 acres, the other 189 acres.[172]  Accordingly, the NIGC disagreed with the Tribe that the Shriner Tract was the first meaningful acquisition, stating that "[c]ertainly the Oklahoma land acquisitions, coming on the heels of tribal restoration, and comprising the land upon which the Tribe currently resides, are nothing if not meaningful."[173]

The NIGC found that the Oklahoma land acquisitions have a strong temporal relationship to tribal restoration and are more appropriately considered the Tribe's restored lands, which were taken into trust within one and six years of restoration and were noted by the BIA for being both a land base for the Tribe and within the Tribe's former reservation.[174]  By contrast, the Shriner Tract was acquired in trust in 1996, a period of eighteen years from the Tribe's restoration in 1978.  In the other land restoration cases, the period between restoration and acquisition ranged from nine years to fourteen years.  While conceding that the difference between fourteen and eighteen years is arguably small, the NIGC was not willing to "push the outer limits of what has

---

[172](AR 1122.)

[173](AR 1122.)

[174]*Id.*

previously been considered an acceptable delay," as the Tribe had not met the other factors for

restored land.  If any land is to be considered restored, it is the Oklahoma land, rather than the

intervening Shriner Tract.

Finally, the NIGC interpreted language in *Grand Traverse II* as suggesting that

previously ceded land must be in an area of historical and cultural significance to be considered

restored.[175]  The NIGC concluded that the fact that the Shriner Tract was ceded, without

qualifying as historically significant, discussed *supra*, does not warrant a finding of

restoration.[176]

The Tribe argues that the NIGC's reasoning is flawed for several reasons.  First, NIGC

failed to adequately explain why fourteen years constitutes a sufficient nexus, yet eighteen years

does not.[177]  Second, NIGC used the wrong historical events to arrive at the eighteen-year gap

figure.  The relevant nexus should be between the date of the Tribe's restoration in 1978 and the

date Congress enacted legislation mandating that lands purchased with ICC judgment funds,

1984, a period of six years.  Third, NIGC erroneously placed significance on the fact that the

Tribe acquired three parcels of land prior to acquisition of the Shriner Tract.  In so doing, the

NIGC disregarded the clearly established pronouncement that the restoration of lands exception

---

[175](AR 1123 (citing *Grand Traverse II*, 198 F. Supp. 2d at 937)).

[176](AR 1123.)

[177]At oral argument, the Tribe offered Ex. 1, a proposed draft regulation entitled "Part 292–Gaming on Trust Lands Acquired After October 17, 1988,"establishing a 25-year time limit for submitting an application to take land into trust for the benefit of a tribe. Section 292.7(b)(2)(iii)(B).  The Court admitted Ex. 1 over the objection of NIGC, which contended that it was not included in the administrative record and thus is outside consideration in an APA appeal.  The Court further notes that proposed Part 292 is merely a proposed regulation that has yet to be published and does not appear to be retroactive.  Even if the Court were to find that the regulation was evidence of the arbitrary nature of the NIGC's decision regarding the temporal factor, it is not enough to overcome the Tribe's shortcomings with respect to the location prong, discussed *supra*.

"implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event."[178]  Finally, the Tribe argues that in making its determination, the NIGC once again relied upon its erroneous interpretation of the Shriner Tract's historical significance to the Wyandotte.

Once again, the Court disagrees.  As with the location prong, the Court's review of the record reveals the NIGC has examined the relevant factors and there is a rational connection between the facts found and the NIGC's decision that the Tribe did not meet the temporal prong of the restoration analysis.  The NIGC recognized that tribes do not have the resources or ability to immediately acquire land upon recognition by the federal government, and acknowledged that the temporal factor takes into account the land acquisition process by which a newly restored tribe acquires once-recognized land.  This process is not without limitations, however, and the NIGC reasonably found that the purchase of the Shriner Tract was not part of a systematic land acquisition plan and did not fit the pattern of other tribal acquisitions.  Moreover, nothing in the IGRA, *Grand Traverse II*, or past decisions supports the Tribe's assertion that the NIGC should have looked at the date Congress enacted legislation for the payment of the ICC judgment as the proper starting point for temporal analysis.  Finally, the NIGC decision is in reasonable accordance with prior court cases, NIGC decisions and DOI opinions.  The Court cannot find that the NIGC clearly erred with respect to its analysis of the temporal prong.

IV.     **Conclusion**

Because the Court finds that the NIGC's final decision that the Tribe does not meet the settlement of a land claim exception to the general prohibition on gaming is arbitrary, capricious

---

[178]*Grand Traverse II*, 198 F. Supp. 2d at 936.

and otherwise not in accordance with the law, it REVERSES the NIGC's September 10, 2004

decision and remands the matter to the agency for proceedings consistent with the terms of this

order.

IT IS SO ORDERED.

Dated this 6th day of July 2006.

  S/ Julie A. Robinson

Julie A. Robinson
United States District Judge